TRESPASS quare clausum fregit "and threw divers dead geese into the well of said plff. and choked and filled up the same, and destroyed the water thereof, and prevented the plff. from having the use and benefit thereof in as ample manner," c. c. The locus inquo was stated to he a certain close in Dover hundred, Kent county.
The proof was, that the deft. stood in the public road and threw the geese (which were his own geese and had been shot by plff. for trespassing) over into the plff.'s well.
 Whereupon
 Frame, for deft. moved a nonsuit.
First. Because there was no proof of an entry on the plff.'s close, and the action should have been in case, as case for erecting water spouts and throwing the water over on another's premises.
Second. Because there was no proof that the trespass was committed in Dover hundred, as laid in the narr; nor even proof that it was committed within the county. (2 Saund. Pl. Ev. 855.)
But on looking into the authorities he gave up the first point as not tenable, and
The court ordered a nonsuit on the other point.a
a In a subsequent case the locus in quo was laid in "Sussex county," and proved to have been at Lewis Town.
The court said they would officially take notice that Lewis Town was in Sussex county. A more important and `difficult question has arisen as to the limits of Sussex county, or the extent of the state's jurisdiction over the bay and river Delaware. It was considered by the late court of oyer and terminer, in the case of the State vs.
Morris, which was an indictment for the murder of the captain of a brig lying off Lewis Town, near the breakwater, and within the pitch of the capes. In the charge delivered to the jury on that occasion, the court expressed the following opinion.
Harrington, chief justice:
"The question of jurisdiction in this cause has excited the serious attention and consideration of the court. It is in some respects a novel question, involving facts in relation to territorial limits heretofore in some degree uncertain and not easily defined with precise accuracy. The exact line of demarcation between the high seas and the bay of Delaware which distinguishes between the jurisdiction of the United States and that of a particular state is necessarily a subject of doubtful locality; but the precise line of division between the states of New Jersey and Delaware having never been determined by any conventional arrangement between the states or the final adjudication of a court of competent authority is still more uncertain and doubtful. It may not be necessary for the court, on this occasion, to determine the full extent of this state's jurisdiction over the Delaware bay so as precisely to locate its eastern boundary; but it will be necessary for us to inquire whether the state has jurisdiction over that part of the bay which was the scene of this alledged murder.
The courts of the United States have jurisdiction of offences of this nature committed "upon the high seas, or in any arm of the sea, or in any river, haven, creek, basin, or bay, within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular state." They have also a specially delegated jurisdiction over a particular point near the mouth of the Delaware bay by virtue of the cession of this state of "so much of the shore, bed and waters of the Delaware bay as are necessary for the erection of a breakwater or other harbor, and for the construction of such defences as may be thought proper at or near the mouth of said bay." The term "high seas," as used in the act of congress, means, in its ordinary sense, the open ocean, as distinguished from a "river, haven, basin, or bay." Upon this clause, therefore, the courts of the United States have not jurisdiction over an offence committed in the Delaware bay, within the pitch of the capes. But the act goes on further to extend the jurisdiction of these courts over offences committed "in any arm of the sea, or in any river, haven, creek, basin, or bay, within the admiralty and maritime jurisdiction of the United States, and out of the jurisdiction of any particular state." The term "out of the jurisdiction of any particular state" means out of any one of the United States; and the intention of congress was to confine the United States' courts to offences committed in bays, rivers, or arms of the sea not embraced within the territorial or jurisdictional limits of any particular state, and over which the process of the courts of such individual state did not run. If, therefore, the Delaware bay, from the pitch of the capes upwards, lies within the territorial limits either of the state of Delaware or New Jersey, and is under the jurisdiction of either or both of these states, the courts of the United States can take no cognizance of offences committed on the bay, but such offences are to be inquired of and punished by the particular state within whose jurisdictional limits they are committed.
The state of Delaware has uniformly claimed the sole and exclusive jurisdiction over the whole of the Delaware bay to low water mark on the Jersey shore, and it has to a certain extent used and exercised jurisdiction over the bay and river by grants of territory, acts of restrictive legislation, and service of process. On the part of the United States there has been no resistance of this claim; but, on the contrary, such acknowledgement of the state's jurisdiction as can be inferred from the acceptance on several occasions of cessions by this state of certain parts of the bay and river for the purpose of erecting forts, piers and breakwaters, for defence against the enemy, or for the protection of commerce. On the part, also, of the state of New Jersey, this claim, though resisted in its full extent, has been partially acceded to and acknowledged, that state having limited her claim of jurisdiction to the main ship channel of the bay. There have been several efforts made by New Jersey to settle this question of boundary between us, and it is to be regretted that our legislature has not acceded to the proposition for a conventional arrangement, or adopted some other course to establish the validity of our claim. So long back as 1782, John Dickinson, in a message to the general assembly of this state, informed that body that a resolution had been adopted by the legislature of New Jersey appointing commissioners "for settling and establishing the line of jurisdiction between that state, Pennsylvania and this state;" that commissioners had also been appointed by the state of Pennsylvania; and he gave it as his opinion that such a measure was "proper to be taken on our part for settling the line of jurisdiction in the bay and river Delaware." The recommendation was not acted upon by the assembly, and though similar propositions have since been made by New Jersey, they have never been acceded to. The convention went on between New Jersey and Pennsylvania, and resulted in an amicable division of the islands, c. within the river, and an agreement that each state should enjoy and exercise, under certain restrictions, a concurrent jurisdiction upon the waters of the river; but that all capital and other offences committed on the river, the juridical investigation and determination thereof should be exclusively vested in the state wherein the offender should be first apprehended, arrested or prosecuted.
In November, 1820, the legislature of New-Jersey passed a law authorizing the governor to appoint commissioners to meet commissioners to be appointed by this state for the purpose of settling the boundary line between the states and defining the jurisdiction of each. The subject was laid before our legislature and referred to a committee, who reported that it Was inexpedient at that time to appoint commissioners for this purpose.
According to the original law defining the boundaries of the several counties in New Jersey, passed in 1709-10, the counties lying upon the bay were bounded by the bay shore, which, so far as it goes, countenances the claim set up by this state to the whole of the Delaware; but in 1821, after a failure of their proposition made the year previous for the mutual appointment of commissioners, the legislature of that state enacted and declared that the boundary lines of the counties of Salem, Cumberland and Cape May were the main ship channel in the river and bay of Delaware adjoining those counties, and they appropriated money for trying the right of the state to this extent, and again made an overture for the arrangement of the dispute by commissioners. The subject was again brought before our legislature for consideration, and the house of representatives resolved "that the jurisdiction and sovereignty of this state extends over the bay or river Delaware to low water mark on the Jersey shore," and again refused to appoint commissioners. The subject was not acted upon in the senate.
Thus stands the case at present. The state of Delaware claiming the sole and exclusive jurisdiction and title to the Delaware Bay, as well by virtue of ancient charters as constant occupation, enjoyment and usage to a time running back previously to, and at the declaration of independence — a claim not controverted, or denied, but rather admitted, by the United States — a claim at one time admitted on the part of the state of New Jersey, so far as the fixing the boundaries of her counties in accordance with it, may fairly be construed an admission, and now only denied by that state so far as regards one half of the bay, from the main ship channel eastwardly to the Jersey shore. We speak of the claim of this state because we apprehend that from continual claim, or rather from the undisturbed and undisputed use, occupancy and enjoyment of territory extending back beyond the declaration of independence, the right andtitle to such territory is established better and more certainly than by reference to chartered limits. Since that great event the states of this Union hold their territory not under charters from the British crown, but under the charter which was sealed with the blood and established by the persevering valour of our revolutionary fathers; from that time each state became itself a proprietor; holding of no other; absolutely seized of the independent sovereignty and uncontrolled jurisdiction within and over the territory then actually in its occupation and enjoyment; with this territory, thus defined, and only thus limited, she entered the confederacy and still holds to the same extent, unless she has granted any of her territory to the United States as most of the states have done for particular objects. At the date of our independence, then, the Delaware Bay was claimed by and in the occupation and enjoyment of the state of Delaware. From the Delaware shore out so far as the main ship channel or middle of the bay the state of New Jersey did not then and has not since asserted any title or set up any claim of jurisdiction; to this extent, therefore this state has always been in the undisputed and undisturbed occupation and use of the bay, claiming title and exercising jurisdiction over its bed and waters. Without deciding, then, to the extent of the resolution of our house of representatives, "that the jurisdiction and sovereignty of this state extends over the bay or river Delaware to low water mark on the Jersey shore," which is unnecessary in this case, we are unanimously of the opinion that the sovereignty and jurisdiction of this state does extend over the bay and river, at least so far as the main ship channel or middle thereof; and in this opinion we are confirmed by the general doctrine recognized by the supreme court of the United States in the case of Handly's lessee, vs. Anthony et al.
where chief justice Marshall lays it down, that "when a great river is the boundary between two nations or states, if the original property is in neither, and there be no convention respecting it, each holds to the middle of the stream. But when, as in (that) case, one state is the original proprietor, and grants the territory on one side only, it retains the river within its domain, and the newly created state extends to the river only." The state of Delaware here claims to be the original proprietor of the whole bay, which is disputed by New-Jersey only as it regards half of it; either, then, according to the principles of general law, supposing the original property of the bay to be in neither of the states, or according to the constant occupancy of this state undisputed by New-Jersey, our jurisdiction to the middle of the stream or main ship channel, is established. All the testimony in this cause goes to show that the offence charged in this indictment was committed on the west side of the main ship channel or middle of the bay, and we are therefore of opinion that it is within the jurisdiction of this state, and consequently that this court has competent authority to inquire into it.
The United States has jurisdiction over a particular part of the Delaware bay by virtue of a cession from this state. The terms of that cession are, "that all the jurisdiction and title of the state of Delaware over and to so much of the shore, bed and waters of the Delaware bay as are necessary for the erection of a breakwater or other harbor, and for the Construction of such defences as may be thought proper at or near the mouth of said bay, be and the same is hereby ceded to the United States of America." The extent of this cession is indefinite — so much as is necessary for the erection of a breakwater — and the act points out no means of determining what portion of the shore, bed and waters is necessary for this purpose; and we are unable to measure its extent, except by reference to what is actually used, to wit, the line of the breakwater as made or contemplated to be made, its length, breadth and depth. This must be the fair construction of the act; for no more land can be necessary for a particular purpose than is used in effecting that purpose, and it reduces the extent of the state's grant in this instance to a very narrow compass. Yet, if the offence charged in this indictment had been committed on the breakwater, or at any place now used or intended to be used in the course of its erection, we are of opinion that such offence would be cognizable in the United States courts only, notwithstanding the partial reservation of jurisdiction subsequently contained in the act. The testimony in this cause leaves us no ground to doubt upon this point. At the time the offence is alledged to have been committed, the brig lay wholly without the present or contemplated line of the breakwater, and not in any portion of the bay which is or will be used or can be necessary for its erection and completion. The jurisdiction therefore still remains in the state.
 judgment of nonsuit.
The case was renewed, in the same form of action, and came on for trial at the April term, 1835.
The deft. offered to prove that at the time he threw the geese in the well he was very much excited; that it was not done from pre-conceived *Page 327 
malice, but on the moment, and that he complained much of the plaintiff having killed his geese.
This testimony was objected to, and insisted on.
Frame. The plaintiff goes for vindictive or exemplary damages; the evidence explains the quo animo and the provocation.
J. M. Clayton. We don't object to competent proof of the state *Page 328 
of feeling under which the deft. did the act; but we object to his declarations as any evidence of the quo animo.
 Frame. They are admissible as a part of the res gesta.
The evidence may go to the jury. The plaintiff seeks to recover not merely compensatory damages, but to make an example of the deft. If Collings was under the impression that Emory had *Page 329 
killed his geese, and on this impression, being excited, threw the geese down the well, whether this impression was well founded or not, it would go to disprove malice; and his declarations to that effect made at the time, being part of the res gesta, may be given in evidence. Roscoe on Evidence 22, c. 1 Phillip's Ev.
218.
 The plaintiff had a verdict.